**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

KELLY STONE, RICHARD BUTLER, and
DERMACARE PACKAGING & PRIVATE
LABEL, LLC,

      Plaintiffs,

               v.

OMRI SHAFRAN and TEXAS MEDICAL
TECHNOLOGY, LLC,

      Defendants.

Case No. 922-cv-80369

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT....................................................................................................3

I.   FLORIDA'S LONG-ARM STATUTE PROVIDES FOR PERSONAL JURISDICTION
     OVER DEFENDANTS................................................................................3

   A.   This Court Has Jurisdiction Over Defendants Because the Claims Arise from
        Defendants' Tortious Acts in the State of Florida.......................................3

      1.   Defendants' arguments that Omri Shafran's defamatory emails were not
           "published"in Florida are wrong on the law and the facts. .....................4

      2.   Defendants cannot avoid jurisdiction simply by denying involvement
           with the defamatory *Bonnie and Clyde* articles.................................7

      3.   Plaintiffs allege and submit proof that the *Bonnie and Clyde* articles
           were published and accessed in Florida. ..........................................9

      4.   The *Noerr-Pennington* doctrine does not and cannot save Defendants
           from long-arm jurisdiction. ..........................................................9

   B.   Defendants' Unsupported and False Claims that TMT Does Not Have an Agent in
        Florida Are Easily Refuted with Evidence Submitted by Plaintiffs. .............10

II.  JURISDICTION OVER DEFENDANTS IS CONSISTENT WITH
     THE DUE PROCESS CLAUSE....................................................................11

III. THE COMPLAINT SURVIVES DISMISSAL FOR FAILURE TO
     STATE A CLAIM. ...................................................................................12

   A.   The Complaint Is Easily Amended to Resolve the Shotgun Pleading Dispute by
        Eliminating Five Sentences. .........................................................12

   B.   The Single Publication Rule Is Inapposite.............................................12

      1.   The Lanham Act and FDUTPA claims survive......................................15

      2.   The tortious interference claims survive. ...........................................16

   C.   The Motion to Dismiss the FDUTPA Claim Fails Because Plaintiffs Are
        Entitled to Declaratory and Injunctive Relief.........................................17

   D.   Plaintiffs Intend to Amend the Tortious Interference Claim. ......................17

## **TABLE OF AUTHORITIES**

### **Cases**

*Alvi Armani Med., Inc. v. Hennessey,*
 629 F. Supp. 2d 1302, 1304-05 (S.D. Fla. 2008) ............................................................ 16

*Bongino v. Daily Beast Co.,* LLC,
 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020)........................................................ 14, 16

*Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.,*
 831 So. 2d 204, 208 (Fla. 4th DCA 2002) ................................................................ 13, 15

*Catalyst Pharmaceuticals, Inc. v. Fullerton,*
 2017 WL 6558397, at *7-8 (S.D. Fla. Aug. 8, 2017) ........................................................ 7

*Club Exploria, LLC v. Aaronson, Austin, P.A.,*
 2019 U.S. Dist. LEXIS 181276, at *9 (M.D. Fla. Oct. 21, 2019) ................................. 13, 15

*Dean v. Easterling,*
 2020 WL 1665482, at *4 (M.D. Fla. Apr. 3, 2020)............................................................ 7

*Firstamerica Dev. Corp. v. Daytona Beach News-Journal Corp.,*
 196 So. 2d 97, 104 (Fla. 1966)................................................................................ 12, 13

*Fridovich v. Fridovich,*
 598 So.2d 65, 69-7070 (Fla. 1992) .................................................................... 13, 14, 15

*Happy Tax Franchising, LLC v. Hill,*
 2021 U.S. Dist. LEXIS 107354................................................................................... 14

*Klayman v. Jud. Watch, Inc.,*
 22 F. Supp. 3d 1240, 1256-57 (S.D. Fla. 2014) ............................................................ 14

*Maletta v. Woodle,*
 U.S. Dist. LEXIS 89583, at *15 (M.D. Fla. May 11, 2021)............................................. 14

*McGlothlin v. Hennelly,*
 2017 WL 6610740, at *3 (M.D. Fla. Dec. 27, 2017)........................................................ 7

*Musto v. Bell S. Telecomms. Corp.,*
 748 So. 2d 296, 297-98 (Fla. 4th DCA 1999) ................................................................ 15

*Orlando Sports Stadium, Inc. v. Sentinel Star Co.,*
 316 So. 2d 607 (Fla. Dist. Ct. App. 1975) ..................................................................... 13

*Price v. Kronenberger,*
 24 So. 3d 775, 776 (Fla. 5th DCA 2009)..................................................................... 4, 6

*Primerica Fin. Servs. v. Mitchell,*
 48 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).................................................................. 16

*Tobinick v. Novella*,
   2015 WL 328236 (S.D. Fla. Jan. 23, 2015) .............................................................. 14, 15

*Trujillo v. Banco Cent. Del Ecuador*,
   17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998).................................................................... 14

*Two Worlds United v. Zylstra*,
   46 So. 3d 1175 (Fla. 2d DCA 2010) .................................................................................. 8

*Tymar Distribution Llc v. Mitchell Grp. United States*,
   2021 U.S. Dist. LEXIS 169760, at *24 (S.D. Fla. Sep. 8, 2021) ....................................... 14

*Verbena Prods. Ltd. Liab. Co. v. BeSweet Creations Inc.*,
   2022 U.S. Dist. LEXIS 27936, at *10 n.3 (S.D. Fla. Feb. 16, 2022) .................................. 15

*Weiland v. Palm Beach Cty. Sheriff's Off.*,
   792 F.3d 1313 (11th Cir. 2015).......................................................................................... 12

*Wendt v. Horowitz*,
   822 So. 2d 1252, 1260 (Fla. 2002) ...................................................................................... 3

**<u>Statutes</u>**

Fla. Stat. § 48.193(1)(a)(1)......................................................................................... *passim*

Fla. Stat. § 48.193(1)(a)(2)......................................................................................... *passim*

**INTRODUCTION**

Many of the contested matters at issue in this Motion to Dismiss (the "Motion") are disputes over fact, not law or interpretation. This is particularly so with respect to Defendants' arguments regarding personal jurisdiction. Defendants' Motion and the declarations signed and submitted by Defendants in support of the Motion make factual assertions that are simply untrue. Ordinarily, the battle over disputed facts is waged in discovery, summary judgment motions, and at trial. In this case, however, Defendants' misstatements pertain to jurisdictional facts, and because Defendants have submitted signed declarations with these false assertions, Plaintiffs must rebut the false claims with evidence at the pleading stage – before discovery – or risk dismissal.

One example is Defendants' insistence that Defendant Texas Medical Technology, LLC ("TMT") does not have an agent/employee in Florida. Henya Hertzel, who also goes by Hanna, is an agent/employee of TMT (her title is "Director") who lives in Boca Raton, Florida. Ms. Hertzel is a key player in the events at issue in this litigation, and her involvement is apparent in the business records, which show that she sold more of the FlowFlex Covid-19 tests that TMT purchased from DermaCare than most of TMT's other salespersons. Indeed, based on the sales records that TMT shared with DermaCare before DermaCare discontinued the business relationship, Ms. Hertzel's sales accounted for 6 of TMT's 21 bulk purchases (29%) of FlowFlex tests from DermaCare in the 25 days between December 30, 2021 and January 24, 2022, when the relationship between the parties disintegrated and DermaCare refused to accept further orders from TMT. Revenue from Ms. Hertzel's sales of FlowFlex tests during those 25 days was approximately $336,960 – the equivalent of 20% of TMT's revenue for sales of FlowFlex tests.[1] In terms of dollars, Ms. Hertzel's sales account for approximately 20% of the transactions between DermaCare and TMT.

Aside from the business records and the LinkedIn profiles, Ms. Hertzel's role as an agent/employee of TMT is documented in the correspondence between DermaCare and TMT,

---

[1] Between December 30, 2021, and January 24, 2002, TMT purchased 265,272 FlowFlex tests from DermaCare at $4.75 each, for a total of $1,260,043. At that time, TMT charged at least $6.50 per test, for minimum total revenue of $1,724,270 and gross profit of $464,226 accrued to TMT in less than four weeks.

between Ms. Hertzel and DermaCare, and between Ms. Hertzel and her customers. Even DermaCare's counsel – including the author of this brief – have emails from TMT and/or TMT's customers that include Ms. Hertzel. Defendant Shafran even copied her on the emails defaming DermaCare (sending them to her at her TMT email address). Current clients of DermaCare's attorneys purchased FlowFlex tests from TMT through Ms. Hertzel (they received only half the tests they paid for and are still waiting for a refund of the other half, many months later). These former TMT customers also have correspondence that shows that Ms. Hertzel is an employee and/or agent of TMT.

In the face of all of this evidence, Defendants submitted to this Court declarations denying that they have a single employee or agent in Florida. The declarations were submitted in support of Defendants' primary argument for dismissal – that courts in Florida cannot assert personal jurisdiction over TMT or Mr. Shafran.  For Plaintiffs, who communicated with Ms. Hertzel in her role as an agent of TMT, Defendants denials are shocking.

And, for Plaintiffs, those denials are also expensive. Because Defendants submitted signed declarations to the Court denying, under oath, critical (and true) jurisdictional facts, Plaintiffs are required to produce counter evidence, prior to discovery.

As explained in detail in the following pages, there are other bases for personal jurisdiction under the long-arm statute aside from Ms. Hertzel's involvement as an agent of TMT in Florida.  Defendants sent numerous defamatory communications into Florida (indeed, every one of the defamatory emails described in the Complaint was sent to between four and eight persons in Florida), and the Bonnie & Clyde articles on the internet were accessed in Florida, satisfying the requirements of § 48.193(1)(a)(2).  We have compiled evidence of these facts, including declarations from persons in Florida that accessed the Bonnie and Clyde article in Florida before the Complaint was filed. Some of those declarations, along with other evidence supporting personal jurisdiction over defendants in this Court, are submitted with this brief.

Defendants also move for dismissal of certain claims pursuant to Rule 12(b)(6), but they do *not* allege that the Complaint fails to adequately plead all of the elements of the Lanham Act, defamation *per se*, or business disparagement claims; thus, it appears that this case will survive the Defendants' Motion if it survives the challenge to personal jurisdiction.  And the case should survive the challenge to personal jurisdiction. But the burden on Plaintiffs is prejudicial.

## ARGUMENT

## I.   FLORIDA'S LONG-ARM STATUTE PROVIDES FOR PERSONAL JURISDICTION OVER DEFENDANTS.

Pursuant to the Florida long-arm statute, Fla. Stat. § 48.193, this Court has jurisdiction over Defendants because the claims arise from Defendants' tortious acts within the state, and independently, the claims arise from Defendants' business venture in the state, and agency within the state.

### A.   This Court Has Jurisdiction Over Defendants Because the Claims Arise from Defendants' Tortious Acts within the State of Florida.

The long-arm statute provides for personal jurisdiction over out-of-state defendants when the claims arise from defendants' "tortious act within this state." Fla. Stat. § 48.193(1)(a)(2). The "defendant's physical presence is not necessary to commit a tortious act in Florida." *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1208 (Fla. 2010), citing *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). "Rather, 'committing a tortious act in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida.'" *Id.*

The Complaint alleges that Defendants directed numerous false and defamatory communications into Florida, including by email (Compl. ¶¶ 44-70) and the shockingly abhorrent article, *2022 Bonnie and Clyde – Rich Butler and Kelly Stone*, posted on numerous internet sites (Compl. ¶¶ 44-70) and recently republished on LinkedIn by TMT's President, Dimitri Menin, *inter alia*.[2]  As explained below, every one of these communications is "a tortious act in Florida" for purposes of § 48.193(1)(a)(2).

---

[2]   Additional communications that were not explicitly alleged in the 25-page complaint were also directed into Florida by email, internet chats, and telephonically.  If the Court finds that the allegations in the Complaint are insufficient to establish jurisdiction, Plaintiffs request opportunity to amend the Complaint to add additional allegations.  Plaintiffs also seek opportunity to engage in jurisdictional discovery as appropriate to refute false statements in Defendants' affidavits.

**1.     Defendants' arguments that Omri Shafran's defamatory emails and were not "published" in Florida are wrong on the law and the facts.**

A defamatory statement sent in an email to one or more recipients in Florida is a tortious act committed in Florida for purposes of the long-arm statute. "The determination of whether certain acts constitute communications into Florida is straightforward when the case concerns . . . e-mails or facsimiles, because those communications are directed to reach a specific recipient in a specific forum[.]" *Internet Solutions*, 39 So. 3d at 1208. It is not necessary to allege that the email was *opened* in Florida, as the tortious act occurs upon "the nonresident defendant's telephonic, electronic, or written communications *into* Florida.'" *Id.* (emphasis in original), quoting *Wendt*, 822 So. 2d at 1260.

It is irrelevant if the email is sent to people outside Florida. *Price v. Kronenberger*, 24 So. 3d 775, 776 (Fla. 5th DCA 2009). In *Price*, an out-of-state defendant argued that he did not target Florida residents when he sent an allegedly defamatory email to a list of members of a veterans' association, only some of whom lived in Florida.  Communication of the alleged defamatory email into Florida is all that is required, and "the plaintiff's complaint 'did just this when it alleged the [nonresident defendant] sent the e-mail to various members of [the association], some of whom live in Florida.'" *Internet Solutions*, 39 So. 3d at 1209, quoting *Price*.

Plaintiffs' Complaint specifies multiple false and defamatory emails that Defendant Shafran sent into Florida. Every one of them was sent to at least two people in Florida (not including the Individual Plaintiffs), as listed below by recipients:

- The email to *The Miami Herald* (¶¶ 44-50) was sent to four residents of Florida: David Wilson of the *Herald* (Miami, FL), Isabella Gorski (Coconut Creek, FL), and Plaintiffs Stone (St John's Co., FL) and Butler (Lake Worth, FL). This email was also sent to two employees of DermaCare that live outside of Florida for a total of six recipients. (Exh. 1 at 1.)

- The email to *The Washington Post* (¶¶ 44-50) was sent to six residents of Florida: Hanna Hertzel (Boca Raton, FL), Naftaly Hertzel (Boca Raton, FL), Brent Butler (Lake Worth, FL), Isabella Gorski, and Plaintiffs Stone and Butler. The remaining fourteen recipients include Mr. Golden at the *Post*, nine recipients at ACON, Demitri Menin (President of TMT), two other TMT employees, and an employee of DermaCare, for a total of twenty recipients. (Exh. 1 at 2.)

- The email to *Bloomberg* (¶¶ 44-50) was sent to the same six residents of Florida: Hanna Hertzel, Naftaly Hertzel, Brent Butler, Isabella Gorski, and Plaintiffs Stone and Butler. Aside from Ms. McBride in the place of Mr. Golden, this email was sent to the same 20 recipients as the email to the *Washington Post*. (Exh. 1 at 3.)

- The email to *CNN* (¶¶ 44-50) was sent to the same six residents of Florida: Hanna Hertzel, Naftaly Hertzel, Brent Butler, Isabella Gorski, and Plaintiffs Stone and Butler. Aside from Ms. Casarez in the place of Mr. Golden, this email was sent to the same 20 recipients as the email to the *Washington Post*. (Exh. 1 at 4.)

- The email to *Delmarva Now* (¶¶ 44-50) was sent to the same six residents of Florida: Hanna Hertzel, Naftaly Hertzel, Brent Butler, Isabella Gorski, and Plaintiffs Stone and Butler. Aside from Mr. Morgan in the place of Mr. Golden, this email was sent to the same 20 recipients as the email to the Washington Post. (Exh. 1 at 5.)

- The email to the FBI (¶ 46) was sent to eight persons in Florida, including George Piro, Special Agent in Charge – Miami Field Office, FBI, Denise Steman, former Chief Operating Officer, and Deputy Special Agent in Charge – Miami Field Office, FBI,[3] Hanna Hertzel, Naftaly Hertzel, Isabella Gorski, Brent Butler, and Plaintiffs Stone and Butler. This email was also sent to Dima Menin and employees of TMT, ACON, and DermaCare, for a total of thirteen recipients. (Exh. 2.)

- The first email to ACON (¶¶ 51-55) was sent to four people in Florida: Hanna Hertzel, Naftaly Hertzel, and Plaintiffs Stone and Butler. This email was also sent to ten other persons, including seven people at Acon email addresses. (Exh. 3.)

- The second email to ACON (¶ 56) was sent to twenty-two people, including six in Florida: Hanna Hertzel, Naftaly Hertzel, Isabella Gorski, Brent Butler, and Plaintiffs Stone and Butler. The remaining sixteen include twelve recipients at ACON, including the company's president, J. Lin. (Exh. 3.)

- The email to QX Logistics (¶¶ 59-62) was sent to twenty people, including four in Florida: Hanna Hertzel, Naftaly Hertzel, and Plaintiffs Stone and Butler. The remaining seventeen include three at QX Logistics and eight at ACON, among others. (Exh. 3.)

- The email to Chinese Ambassadors at the U.S. Department of State (¶ 58) was sent to six persons in Florida: Hanna Hertzel, Naftaly Hertzel, Isabella Gorski, Brent Butler, and Plaintiffs Stone and Butler, as well as numerous persons at ACON. (Exh. 3.)

- The email to Attorney Ben England (¶64) was also sent to Stephen Gorka, a Florida resident.

---

[3] Ms. Steman retired from the FBI in December 2021, according to her LinkedIn profile. She still lives in the Miami-Fort Lauderdale area but may not have received Defendant Shafran's email as she retired from the FBI two to three months earlier.

- The email exchange with Stephen Gorka (¶70) was also sent to two of his business associates, also in Florida.

Defendants argue that all but two of the defamatory emails were not sent to recipients in Florida. (Motion at 9.)  Defendants are wrong on the facts. Every one of these emails was sent to multiple residents of Florida. Defendant Shafran must be well aware of that fact, as he himself sent the emails to the recipients in Florida from his own email account.  And, because he is required under the litigation hold to maintain those emails, he could easily refresh his recollection as to who (and where) he sent them.

Defendants also argue that even with respect to the few emails that they acknowledge were sent to recipients in Florida, *e.g.*, the email to *The Miami Herald*, § 48.193(1)(a)(2) does not apply because the Complaint does not explicitly allege that the emails were "actually accessed" in Florida. (Motion at 9.)  Defendants are wrong on the law. A plaintiff need not allege that an email was actually opened in Florida for jurisdiction under § 48.193(1)(a)(2). *See Internet Solutions*, 39 So. 3d at 1208; *Price v. Kronenberger*, 24 So. 3d at 776.

The Motion appears to argue that *Internet Solutions* holds that an email must be opened in Florida for § 48.193(1)(a)(2) to apply. (Motion at 8.)  However, in the portion of Internet Solutions relied on by Defendants, the Florida Supreme Court was speaking to defamatory statements on web pages universally available on the internet, *not email*. Under the heading, "Interpretation of Section 48.193(1)(b) in the Context of the World Wide Web," *Internet Solutions* revisits the standard for email, telephonic, and written communications ("this Court interpreted section 48.193(1)(b) to include electronic communication 'into' the state," 39 So. 3d at 1214) and then turned to the question of whether the same standard should apply to websites. Taking into consideration "the nature of the Web, *which is fundamentally different from . . . e-mail*," the Court held that with respect to defamation on websites (only), § 48.193(1)(a)(2) will applies where "the website posts containing the statements are accessible in Florida and accessed in Florida." *Id.* at 1216. *Internet Solutions* did not modify the standard for communications made by email, telephone, fax, or other writings.

Although Defendants purport that cases are routinely dismissed "when plaintiffs fail to 'show' that any third party ever accessed" the defamatory statements in Florida, they fail to cite a

single case involving email.[4]  *McGlothlin v. Hennelly,* 2017 WL 6610740, at *3 (M.D. Fla. Dec. 27, 2017), *Catalyst Pharmaceuticals, Inc. v. Fullerton*, 2017 WL 6558397, at *7-8 (S.D. Fla. Aug. 8, 2017) and *Dean v. Easterling*, 2020 WL 1665482, at *4 (M.D. Fla. Apr. 3, 2020) all involve websites, not email.

> ### 2.    Defendants cannot avoid jurisdiction simply by denying involvement with the defamatory *Bonnie and Clyde* articles.

In Count Four of the Complaint, Individual Plaintiffs Kelly Stone and Rich Butler bring a claim for defamation *per se* arising from the abhorrent defamatory statements in the article "2022 Bonnie and Clyde – Rich Butler and Kelly Stone" published on numerous internet sites. (Compl. ¶¶35-43 & ¶¶ 110-114.)  The Complaint adequately alleges the elements of the claim.

Defendants apparently agree. Defendants move for dismissal of three of the five counts for failure to state a claim. (Motion at 18-23.)  Count Four is not one of them. The Motion does not argue, at any point, that the Complaint fails to allege ultimate facts sufficient to satisfy the pleading standard with respect to Count IV.  Nor does the Motion argue that the Complaint fails to allege jurisdictional facts sufficient for long-arm jurisdiction pursuant to § 48.193(1)(a)(2). Instead, Defendants argue that the Court lacks jurisdiction because, even though the Complaint adequately alleges jurisdictional facts sufficient to satisfy the long-arm statute, Defendants signed and submitted declarations (they did not submit notarized affidavits) that essentially say, "It wasn't us. It was someone else."

As discussed extensively elsewhere in this Opposition, *both Shafran's and Menin's declarations falsely state that Defendants do not have an agent or employee in Florida*. Actual documentary evidence is submitted by Plaintiffs that disproves statement in the declarations. *Shafran's original declaration also falsely stated that he had never been in Florida on business.* After Plaintiffs' counsel informed defense counsel that Defendant Shafran had met with Plaintiff Butler in DermaCare's office space in Florida, and that the manager of the office space would offer evidence to prove that fact, Shafran submitted an "Amended Declaration," purporting to fix

---

[4] Moreover, even with respect to statements made on universally available websites, the pleading standard would not require that a plaintiff "show" that the email was opened in Florida. Plaintiffs must adequately plead jurisdictional facts but are not required to produce evidence of such facts to survive a motion to dismiss. Only if Defendants submit an affidavit or other evidence contradicting alleged are Plaintiffs required to submit evidence to "show" that the required jurisdictional facts are in fact present.

the error. *But even Shafran's Amended Declaration includes false statements.*

For example, the Amended Affidavit states, "Because I was already in Florida on vacation, I briefly met with Richard Butler for approximately 30 minutes. No transaction was conducted or completed at the time. TMT and DermaCare Packaging & Private Label, LLC, had already reached an agreement for the purchase of COVID-19 Test Kits." (Shafran Amend. Decl. ¶5.) Plaintiffs submit two declarations refuting the new language that was apparently intended to justify the false statement in the original. Plaintiff Butler's declaration states that a transaction was conducted at the meeting and that TMT and DermaCare had not already reached an agreement. (R. Butler Decl. ¶¶ 3-5.) The declaration of Sistie Kimelman, the manager of DermaCare's office space, states that the meeting was at least 90 minutes long (she left the building after 90 minutes), that it was the first meeting between the participants, that she understood that they were still negotiating a potential first agreement, that the meeting was loud and intense, and that her impression was that Defendant Shafran was pressuring Plaintiff Butler about how quickly DermaCare would be able to deliver the tests. (Kimelman Decl. ¶¶ 1-13.)

***Plaintiffs hereby request an evidentiary hearing and jurisdictional discovery to allow opportunity to rebut Defendants' unsupported denials if the Court finds no other basis for long-arm jurisdiction.*** Plaintiffs have adequately alleged jurisdictional facts. Defendants have the opportunity to present evidence disputing the jurisdictional facts. Next, according to the very same cases that Defendants rely on, Plaintiffs may challenge Defendants' denials.

We note that the context here is quite different from that in *Two Worlds United v. Zylstra*, 46 So. 3d 1175 (Fla. 2d DCA 2010). In *Two Worlds*, the defendant's affidavit denied ownership of the website – a fact also provable by documentary evidence. The plaintiff did not seek an evidentiary hearing, perhaps because of that documentation.

In contrast, Plaintiffs in this case do not allege that Shafran or TMT own the websites that post the Bonnie and Clyde article. Plaintiffs are certain, however, that Defendants submitted, or had someone else submit, the Bonnie and Clyde article to pay-for-post websites, among others. There is no documentary evidence available to disprove that, and there is substantial circumstantial evidence to rebut it.

Given the other self-serving falsehoods in the Shafran and Melin Declarations, jurisdictional discovery and an evidentiary hearing are appropriate and necessary to ensure that the Plaintiffs' well-plead complaint case is not dismissed on self-serving, unsupported denials.

### 3.    Plaintiffs allege and submit proof that the *Bonnie and Clyde* articles were published and accessed in Florida.

The *Bonnie & Clyde* articles are personally upsetting to the Individual Plaintiffs, whose families are also hurt by the personal nature of the libelous articles, and that the articles are also seen by their personal friends and social groups. The Complaint describes one particularly disturbing incident where the libel was "accessed in Florida."  When Plaintiff Stone's nine-year-old daughter's class was given a lesson on the internet, the fourth graders googled their parents. At the top of Plaintiff Stone's daughters search results were the *Bonnie & Clyde* articles, including the photoshopped picture inserting Plaintiff Butler's face over Plaintiff Stone's husband. Plaintiff Stone's daughter saw the articles and the picture and asked her mother about them – including why her father was replaced with Plaintiff Butler. (Compl. ¶39.)

As evidence that the Bonnie & Clyde articles were accessed in Florida, submitted with this Opposition is Plaintiff Stone's signed declaration relaying the above incident and declarations from __ other friends, family members, business associates, and acquaintances of Plaintiffs Stone and Butler, each affirming that they read the Bonnie and Clyde article on the internet, while in the state of Florida, and prior to the initiation of this lawsuit.

### 4.    The *Noerr-Pennington* doctrine does not and cannot save Defendants from long-arm jurisdiction.

Defendants cannot avoid the jurisdiction of a Florida court with respect to false statements made to the Florida Attorney General's office by asserting *Noerr-Pennington*. (Motion at 10.)  First, the *Noerr-Pennington* doctrine is a defense that goes to liability, not jurisdiction. Defendants do not cite a single case where the *Noerr-Pennington* doctrine is even referenced with respect to jurisdiction, and Plaintiffs' research failed to identify a single one.

This is not surprising, as *Noerr-Pennington* applies only where the complainant is acting in good faith, raising a factual question about the speaker's intent that is inappropriate if not impossible to resolve at the pleading stage and before discovery. The Motion claims that Shafran "merely reported, in good faith, that TMT paid DermaCare for products that it did not receive[.]" (Motion at 10.)  This single, unsupported assertion in a brief is not evidence sufficient for the Court to make a factual finding on intent that would relieve a Defendant of any liability.[5]

---

[5] Application of the *Noerr-Pennington* doctrine to long-arm jurisdiction would not only apply to

Second, in the context of this case – where the submission to the Attorney General included factual statements that Defendants knew were false (*i.e.*, the claim that DermaCare had not delivered any of the *FlowFlex* tests that TMT ordered, when TMT certainly knew what deliveries it had receive, and bills of lading document those deliveries) and was made on the same day (and relate to) a dozen false, defamatory, and/or threatening emails directed at the same victim, the "good faith" of Shafran's submission to the Attorney General must be subjected to fact-finding and a factual determination by a judge or jury before Noerr-Pennington is applied.

### B.   Defendants' Unsupported and False Claims that TMT Does Not Have an Agent in Florida Are Easily Refuted with Evidence Submitted by Plaintiffs.

 As discussed in the Introduction, *supra*, an agent and employee of TMT who lives and works in Florida was heavily involved in the purchase and resale of the FlowFlex tests distributed to TMT by DermaCare. Ms. Hertzel's sales of FlowFlex tests account for 30% of TMT's transactions involving FlowFlex, and 20% of the sales by revenue.

Defendants, however, simply refuse to admit that the Ms. Hertzog works for TMT. Instead, both Omri Shafran, CEO, and Dimitri Menin, President of TMT, signed and submitted to the Court signed declarations stating that "[a]ll of TMT's employees and key personnel are located in and perform their work related to TMT in Texas" (Menin Decl., ¶ 6), that "[a]ll work related to the business of TMT is carried out in Texas, from TMT's principal place of business," (Menin Decl. ¶ 7), and that "TMT has never sent any employees, directors, or officers to conduct business or marketing in Florida." (Menin Decl. ¶ 15.)

To rebut Defendants' declarations, Plaintiffs submit the following documentary evidence:

- Communications between Ms. Hertzog and Plaintiff Richard Butler (*see* Butler Decl., Exh. A)

- Ms. Hertzog's own LinkedIn profile, stating that she is an employee of TMT and that she lives in Boca Raton, Florida (Butler Decl., Exh. C)

- A printout from the employee search function on TMT's LinkedIn profile showing the results of a search for "Hertzog" and indicating one employee in Boca Raton, Florida (Butler Decl., Exh. C)

---

that court's jurisdiction over the defendant, but would foreclose liability in *every* court in *every* jurisdiction.

- Emails from Defendant Shafran to Ms. Hertzog at her Texas Medical Technology email account (Exh. 1, Exh. 2, & Exh.3, *inter alia*.)

- Email from ACON Labs to DermaCare communicating a phone call from Ms. Hertzog to ACON (Butler Decl., Exh. B).

## II.   JURISDICTION OVER DEFENDANTS IS CONSISTENT WITH THE DUE PROCESS CLAUSE

Defendants argue that Plaintiffs' claims do not arise out of, or relate to, activities in Florida. The Motion claims that only four of the defamatory communications were directed at Florida. (Motion at 12.)  As discussed above, Defendants are simply wrong. Every one of the defamatory communications was directed to multiple Florida residents.

Moreover, Defendants specifically targeted Florida. The decision to send a defamatory email to *The Miami Herald* was not random or arrived at by chance. Defendants otherwise sent the defamatory email to national media outlets: *CNN*, *Bloomberg*, *The Washington Post*. *The Miami Herald* is a regional newspaper, with a far smaller readership.

Shafran did not send the defamatory email to papers with much larger readership than the *Herald*. The *Chicago Tribune* did not receive an email from Shafran. Nor did *The New York Times*, *The Los Angeles Times*, *The San Francisco Chronicle*, *The Atlanta Journal Constitution*, or *The Boston Globe.*, or *New York Times* – all newspapers with a much larger distribution than the *Herald*. Nor did Defendants send a defamatory email to any of the papers in their home state of Texas. Defendants wrote to *The Miami Herald* because they were targeting Florida, the Plaintiffs' home state.

The defamatory email to the FBI targeted Florida as well. Defendants did not send the defamatory email to FBI headquarters in Washington, D.C., or to a field office in their home state of Texas, or to any other field office. Defendants sent the defamatory email to the Miami field office only, and they did so specifically to target Florida.

The false accusations submitted to the Florida Attorney General's Office clearly target Florida; indeed, it is difficult to imagine an act that more clearly avails a defendant to the law enforcement authority of the state, and *Noerr-Pennington* is inapplicable at this stage and on these facts, as discussed above.

### III.   THE COMPLAINT SURVIVES DISMISSAL FOR FAILURE TO STATE A CLAIM.

#### A.   The Complaint Is Easily Amended to Resolve the Shotgun Pleading Dispute by Eliminating the Introductory Sentences at Issue.

Defendants argue that the complaint, as a whole, is a shotgun pleading because – and only because – the first sentence of each of the five counts begins with the sentence, "Plaintiff realleges and incorporates herein by reference each and every allegation of this Complaint as if fully set forth herein."  (Motion at 24.)

It is an issue of form over substance:  The inclusion of that sentence on the top of each count is Defendants' only basis to argue that the Complaint is a shotgun pleading. Defendants do not argue that any of the substantive characteristics of a shotgun pleading are present. They do not argue that those five sentences, alone, render the Complaint unclear, confusing, or that the pleadings in the Complaint "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland v. Palm Beach Cty. Sheriff's Off*., 792 F.3d 1313 (11th Cir. 2015); *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018) (quoting *Weiland*). Where a complaint is clear and well-organized, such that defendants understand the basis of the claims, courts are reluctant to dismiss a complaint merely on the first sentence of the counts.

That said, Plaintiffs are willing to file an amended complaint to resolve the issues in form that Defendant identified. "In the special circumstance of non-merits dismissals on shotgun pleading grounds, we have required district courts to *sua sponte* allow a litigant one chance to remedy such deficiencies." *Vibe Micro*, 878 F.3d at 1295. If this Court determines that the Complaint is a shotgun complaint, Plaintiffs will take that opportunity and resolve the form issues in an amended complaint.

Similarly, Plaintiff's amended complaint will eliminate and replace the sentence specific to the Lanham Act claim that Defendants also raise.

#### B.   The Single Publication Rule Is Inapposite.

The Florida Supreme Court, in dicta, underscored the rule's vital history and policy, which support the denial of Defendant's MTD. *Firstamerica Dev. Corp. v. Daytona Beach News-Journal Corp*., 196 So. 2d 97, 104 (Fla. 1966). Florida Courts have refused to apply the

12

single publication rule to cases where each count includes *additional* allegations. *See e.g.*, *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2019 U.S. Dist. LEXIS 181276, at *9 (M.D. Fla. Oct. 21, 2019)(emphasis added), *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992); *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002).

The Florida Supreme Court has noted those the single publication rule merits are limited to limiting the plaintiff to one all-encompassing cause of action; avoiding a multiplicity of suits, restricting conflicts of laws, and setting one time for the running of limitations. *Firstamerica Dev. Corp.*, 196 So. 2d 97, 104 (Fla. 1966). The merit arguably applicable in this case is limiting the Plaintiffs to one all-encompassing cause of action. Crucially, this limitation was sprouted from the growth of mass communications. *Id.* at 101. In turn, Florida courts began treating a single edition of a newspaper as a single publication. *Id.* Under this approach, "the wideness of the dissemination of a particular edition does not give rise to separate torts but goes instead to the issue of damages." *Id.* Courts throughout the years have clarified that the single publication rule limits a *single* publication to "give rise to a *single* cause of action, and the various injuries resulting from it are merely items of damage arising from the *same* wrong" or simply recharacterizing a defamation claim. *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002) (Citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607 (Fla. Dist. Ct. App. 1975)).

Decisively, Florida Courts have limited the application of the rule "where the secondary counts are *based solely on the facts underpinning the defamation count*." *See Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2019 U.S. Dist. LEXIS 181276, at *9 (M.D. Fla. Oct. 21, 2019)(denying a motion to dismiss based on the inapplicability of single-action rule to a Tortious Interference and FDUTPA claim)(emphasis in original); *see also, e.g., Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992) (stating in dicta "Obviously, if the *sole* basis of a complaint for emotional distress is a privileged defamatory statement, then no separate cause of action exists." (emphasis in original)); *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (finding claims barred where they were "based on the same facts and circumstances as the . . . disparagement claim").

Plaintiffs' claims are brought forth individually and collectively. (Compliant ("Comp"), Dkt No. 1, ¶¶. 84-120). Notably, the Corporate Plaintiff brought forward the Lanham Act (Count

I), FDUTPA (Count II), business disparagement (Count III), and Plaintiffs brought forth the allegation of the tortious interference with a business relationship (Count VI).

The Complaint cites more than nineteen (19) gross instances where Defendants independently published false defamatory statements about Plaintiffs. (Comp., Dkt No. 1, ¶¶. 5, 23, 34-39, 42, 44, 46, 48, 51, 56, 57- 59, 64-66). This far exceeds the one publication rule the foregoing authorities have cautioned about.

Not one case cited by Defendant includes a plethora of distinct publications targeted at numerous specific individuals with malicious intent. *See Tobinick v. Novella*, 2015 WL 328236, at *36 (S.D. Fla. Jan. 23, 2015) (citation omitted) (alteration in original) (Tortious interference claim barred for involved the *same* allegedly defamatory statements made in *two* separate articles); *Fridovich v. Fridovich*, 598 So.2d 65, 70 (Fla. 1992)(Malicious defamation was orchestrated by siblings who intentionally provided false *defamatory statements against Defendant brother to police*; *Bongino v. Daily Beast Co.*, LLC, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020)(Claims stem from the *same article* as the defamation claim); *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1256-57 (S.D. Fla. 2014) (dismissing plaintiff's claims based on the same *a single, website publication); Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998) (dismissing false light invasion of privacy claim because it was based on the same Press Release); *Maletta v. Woodle*, No. 2:20-cv-1004-JES-MRM, 2021 U.S. Dist. LEXIS 89583, at *15 (M.D. Fla. May 11, 2021) (same defamatory letter used for both the conspiracy and defamation claim); *Tymar Distribution Llc v. Mitchell Grp. United States*, No. 21-21976-CIV-ALTONAGA/Torres, 2021 U.S. Dist. LEXIS 169760, at *24 (S.D. Fla. Sep. 8, 2021)( Plaintiff's tortious interference claim is barred because the claim is premised on the *same* defamatory publication).

Defendant relies too heavily on *Happy Tax Franchising, LLC v. Hill*, 2021 U.S. Dist. LEXIS 107354. In *Happy Tax*, the alleged defamatory and disparagement campaign included merely five (5) verbal statements and an *anonymous* email campaign. *Id.* at *3-*4 (emphasis added). Notwithstanding, the Musto Court's detailed analysis of the application of the rule, the Happy Court, in dicta, concludes that "the Rule limits a plaintiff to a single cause of action, no matter the number of defamatory statements the claim is predicated upon." *Id.* at *20-21. Contrastingly, the Musto Court underscores that the rule is "applied where the same communication is heard at the same time by two or more persons. *Musto v. Bell S. Telecomms.*

*Corp.*, 748 So. 2d 296, 297-98 (Fla. 4th DCA 1999)(analyzing the Restatement (Second) of Torts § 577A cmt. b (1977), which comments that the "'single publication rule' treats the communication to the entire group as one publication giving rise to only one cause of action 'in order to avoid multiplicity of actions and undue harassment of the defendant by repeated suits by new individuals, as well as excessive damages that might have been recovered in numerous separate suits….' *Id.* A stark contrast to the present case where the Plaintiffs cited an overwhelming number of *examples* of Defendant's malicious defamatory campaign to independent groups – specifically a targeted email campaign, verbal communications to customers and business partners, numerous website publications, complaints to foreign and domestic governments where each set of publication included different information and coercive conduct intended to defame and disparage Plaintiffs, respectively.

Plaintiffs' claims survive the single publication rule because 1) Defendant's distinct publications were sent calculatedly to separate groups, and 2) each count has additional facts than those underpinning the defamation and disparagement counts. Fundamentally, Florida case law does not prohibit the overlap of analogous underlying facts; it requires that each count includes additional allegations. *See e.g.*, *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2019 U.S. Dist. LEXIS 181276, at *9 (M.D. Fla. Oct. 21, 2019), *Fridovich v. Fridovich*, 598 So.2d 65, 70 (Fla. 1992)( the successful invocation of a defamation privilege will not prevent recovery upon separate causes of action which are properly pled upon the existence of independent facts); *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002).

### 1.     The Lanham Act and FDUTPA claims survive.

Florida Courts have permitted Lanham Acts and FDUTPA claims to survive the single publication rule. *See* e.g, *Tobinick v. Novella*, 2015 WL 328236, at *11 (S.D. Fla. Jan. 23, 2015) (permitting a FDUTPA claim to survive); *See also e.g., Verbena Prods. Ltd. Liab. Co. v. BeSweet Creations Inc.*, No. 21-CV-23797-PCH, 2022 U.S. Dist. LEXIS 27936, at *10 n.3 (S.D. Fla. Feb. 16, 2022)(permitting a Lanham Act to claim to survive the single publication rule).

Plaintiffs allege the following in the Lanham Act claim: Defendant's false statements were published in emails, internet sites, voice, text messages, and instant messaging. (Comp, Dkt No. 1, ¶ 90). Specifically, the count refers to the factual background in the Compliant which describes the false and disparaging statements used to divert blame from TMT for misleading its

own customers. (Comp, Dkt No. 1, ¶¶ 84, 89) (referencing ¶¶. 5, 23, 34-39, 42, 44, 46, 48, 51, 56, 57- 59, 64-66 which describe distinct emails to major media, including The Miami Herald, Bloomberg, CNN, The Washington Post, and Delmarva Now; distinct emails to the domestic and foreign governments; distinct emails to Plaintiff's business partners; Bonnie & Clyde publications; and communications to Defendant' customers and plaintiffs' attorney.

Plaintiffs allege the following distinction in the FDUTPA claim: Defendants' conduct is willful in that they knowingly make false statements about Plaintiffs in an effort to mislead consumers and unfairly drive business away from DermaCare. (*See Id.* at ¶ 102) (referring to ¶ 25 and 26 in the factual background which describes Defendant's willful conduct in knowingly making false statements: Defendant's customer complaints to Plaintiffs based on Defendant's defamatory statements, notwithstanding TMT having received every delivery promptly).

Regarding Plaintiff's business disparagement claim, Plaintiff alleges the same and additional conduct as both Lanham Act and FDUTPA claim but seeks damage and relief that are separate and distinct from the previous counts; namely the injunctive relief (*Id.* ¶ 109).

Plaintiff is not transforming the underlying facts on which the disparagement claim is based on into the underlying facts for the Lanham Act and FDUTPA claim. There are alleged on an independent basis for each count which merits surviving the single publication rule. *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1320-21 (S.D. Fla. 2020)  (citing *Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1304-05 (S.D. Fla. 2008), where a court in this District permitted the plaintiffs to proceed with their FDUTPA claim because their complaint "alleged an independent basis" for that claim, "namely, [d]efendants' deceptive and misleading conduct, *separate and apart* from defamatory statements." (emphasis added in original)). Similarly, *in Primerica Fin. Servs. v. Mitchell*, 48 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999), the plaintiff pled "other circumstances and facts," separate from the allegedly untruthful statements. *Id*.

### 2.    The tortious interference claims survive.

Plaintiffs allege the following distinctions in the tortious interference with contract claim: Plaintiffs had ongoing and prospective business relationships with wholesalers, suppliers, and warehouse and logistics partners that were damaged or lost as a consequence of Defendants' false and deceptive statements. (Comp, Dkt No. 1, ¶¶ 115,116) (referring to ¶ 53 in the factual background which describes Defendants' targeted and distinct malicious conduct when it

16

engaged in defamatory and coercive emails communications with Acon).

Regarding Plaintiff's business disparagement claim, Plaintiff has described above the unique relief sought (*see Id.* ¶ 109). Similarly, Plaintiff's defamation claim sets forth additional facts, including the Bonnie and Clyde and embezzlement defamatory statements which have resulted in a unique injury: personal hatred, distrust, ridicule, contempt, and disgrace. (*see Id.* ¶ 113).

Defendant unconvincingly argues that "each claim relies on the alleged Articles and the same series of alleged communications containing virtually identical statements," and mistakenly ignores the distinguishing circumstances from the cases cited and the conduct of the Defendants. This is not an instance where the same or similar publications were disseminated and caused the same wrong which Florida court prohibit. The alleged harms about which Plaintiffs complains count are not mere consequences flowing from the one group of defamatory statements. Each publication was tactfully targeted at a different audience and for different purposes causing unique harm to Plaintiffs individually and collectively. Each harm can only be redressable through his separate claims. At this stage in the litigation, the Court has no reason to hold that a defamation or disparagement claim would necessarily be dismissed since Defendant has not raised them. Therefore, all claims survive the single publication rule.

### C.   The Motion to Dismiss the FDUTPA Claim Fails Because Plaintiffs Are Entitled to Declaratory and Injunctive Relief.

Defendants move for dismissal of Plaintiffs FDUPTA claim on the grounds that the Complaint fails to allege actual damages. Setting aside Defendants' characterization of the allegations – Plaintiffs do not agree or concede that the actual damages are not pled - Defendants' argument only goes to monetary relief. Plaintiffs seek declaratory and injunctive relief under FDUPTA, and Defendants do not and cannot argue that the claims seeking non-monetary relief should be dismissed.

Additionally, Plaintiffs intend to include additional facts, including facts showing actual damages, in an amended complaint.

### D.   Plaintiffs Intend to Amend the Tortious Interference Claim.

The Motion argues that Plaintiffs fail to adequately allege tortious interference, because the Complaint fails to identify any business relationship that Defendants interfered with.  The

Complaint not only specifies those relationships – ACON and QX Logistics – but describes in detail the defamatory emails sent to both companies. That said, Plaintiffs intend to amend the allegations specific to tortious interference to address recent developments.

*   *   *   *

For all of the reasons detailed above, Plaintiffs respectfully request that the Court deny Defendants Motion to Dismiss the Complaint.

Dated:  May 25, 2022                  Signed: /s/ *Denise Calle*

Denise Calle (FL Bar No. 127292)
Jennifer Gross (DC Bar No. 1003811)
*Admitted pro hac vice*
Hannah Kreinik (IL Bar No. 289480)
*Admitted pro hac vice*

**Benjamin L. England & Associates, LLC**

810 Landmark Drive, Suite 126
Glen Burnie, MD 21061
Phone: (410) 220-2800
jgross@englandlawgroup.com
dcalle@englandlawgroup.com
hbkreinik@englandlawgroup.com

*Counsel for Plaintiffs*