# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| KELLY STONE, RICHARD BUTLER, and DERMACARE PACKAGING & PRIVATE LABEL, LLC<br><br>        Plaintiffs,<br><br>                         v.<br><br>OMRI SHAFRAN, DIMITRI MENIN, and TEXAS MEDICAL TECHNOLOGY, LLC,<br><br>        Defendants. | Case No. 9:22-cv-80369<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Kelly Stone and Richard Butler ("the Individual Plaintiffs") and Plaintiff DermaCare Packaging & Private Label, LLC (collectively, "Plaintiffs"), bring this action against Omri Safran, Dimitri Menin, and Texas Medical Technology, LLC (collectively, "Defendants"), alleging defamation, business disparagement, violation of the Lanham Act, violation of the Florida Deceptive and Unfair Trade Practices Act, and tortious interference with business relationships. Plaintiffs allege as follows:

## PARTIES

1.      Plaintiff DermaCare Packaging & Private Label, LLC ("DermaCare") is a Florida limited liability corporation with its primary place of business in Delray

Beach, Florida.

2.      Plaintiff Kelly Stone is a citizen and resident of the state of Florida and CEO of DermaCare.  Plaintiff Stone brings claims in her personal capacity for libel and slander.

3.      Plaintiff Richard Butler is a citizen and resident of the state of Florida and Managing Director of DermaCare.  Plaintiff Butler brings claims in his personal capacity for libel and slander.

4.      Defendant Texas Medical Technology, LLC ("TMT") is a limited liability company organized in Texas, with its principal place of business in Houston, Texas.  TMT was formerly known as Texas Medical Center Supply, LLC.

5.      Defendant Omri Safran is a resident of the state of Texas and the Chief Executive Officer ("CEO") of TMT.  Defendant Safran cofounded TMT with Defendant Menin.

6.      Defendant Dimitri Menin is a resident of the state of Texas and the President of TMT.  Defendant Menin cofounded TMT with Defendant Safran.

## JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

7.      Plaintiffs allege violations of the Lanham Act, 15 U.S.C. 1125(a). Accordingly, this Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 15 U.S.C. § 1121(a).

8.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court also has subject matter jurisdiction over all of Plaintiffs' claims on the separate and independent ground of diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Venue

10.      Venue is properly in the Southern District of Florida by operation of 28 U.S.C. § 1391.  First, the communications at issue took place in Florida, as recipients were in the state of Florida when they were received.  Second, the communications at issue impacted Plaintiffs in the Southern District of Florida.

Personal Jurisdiction

11.      This Court has personal jurisdiction over Defendants pursuant to Florida Statute § 48.193(1)(a)(1) because Plaintiffs' claims arise from Defendants' business operations in the state of Florida, including through an agent of Defendants who is a resident of Florida and who works for Defendants within the geographical boundaries of Florida.

12.      Henya Hertzel, who also goes by Hanna, is an agent/employee of TMT (her title is "Director") who lives in and works for Defendants from an office or home office in Boca Raton, Florida.  Ms. Hertzel is a key player in the events at issue in this litigation.[1]

---

[1] Ms. Hertzel's sales account for 29% of the transactions between Plaintiffs and Defendants.

13.     The claims also arise from Defendants own, direct, business activity in Florida, other than the activities of their agents.  Defendant Shafran, on behalf of other Defendants, negotiated the deal at issue in this litigation with Plaintiff Butler within the geographic boundaries of Florida, where they met in person.

14.     This Court also has personal jurisdiction over Defendants pursuant to Florida Statute § 48.193(1)(a)(2), because the Plaintiffs are Florida residents who were injured in Florida and the claims arise from Defendants' "tortious acts within the state" of Florida, in that each of Defendants' false and defamatory statements alleged in the complaint were communicated into Florida.  Fla. Stat. § 48.193(1)(a)(2).  Specifically, every false and defamatory email alleged in ¶¶ 54-75 was sent to at least two persons in Florida (other than the Plaintiffs), the defamatory articles posted on the internet (¶¶ 41-50) were both accessible in Florida and actually accessed by numerous persons in Florida, the false and defamatory statements submitted to the Florida Attorney General's office and the Miami field office of the FBI were in fact directed to, received, and acknowledged by law enforcement in Florida; and false defamatory statements were made telephonically to persons in Florida (¶¶ 61-85).

15.     Additional tortious acts were committed by Defendants' agent, Henya Hertzel, a Florida resident.  (¶¶ 84-85.)  Defendants are subject to personal jurisdiction in Florida for claims arising from the acts of their agent when that agent acts within the geographic boundaries of Florida.  § 48.193(1)(a)(2).

16.     Even if the Court did not have personal jurisdiction over each

Defendant with respect to every claim, as Plaintiffs sufficiently allege, the doctrine of pendent jurisdiction provides discretion for the Court to assert personal jurisdiction over those claims that arise "out of the same common nucleus of operative fact as does a claim that is within the *in personam* jurisdiction power of the court." *Ultimate Fitness Grp., LLC v. Felix*, 2018 U.S. Dist. LEXIS 210400, at *12-13 (S.D. Fla. Dec. 11, 2018), quoting *Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se. LLC*, 2014 U.S. Dist. LEXIS 41016 (M.D. Fla. Mar. 27, 2014) (quoting 4A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1069.7, at 236 (3d ed. 2002).

## STATEMENT OF FACTS

### I.    BACKGROUND FACTS

#### A.    DermaCare, Acon, and Flowflex Tests

17.    Plaintiff DermaCare is an authorized distributor of Flowflex™ COVID-19 Antigen Home Tests ("Flowflex Tests"), pursuant to a non-exclusive distribution agreement between DermaCare and ACON Labs, Inc. ("Acon"), the manufacturer of Flowflex Tests.  DermaCare is one of twenty distributors authorized to distribute Flowflex Tests in the United States.

18.    Pursuant to the agreement between DermaCare and Acon, DermaCare places orders with Acon for Flowflex Tests on a production basis.  That is, upon prepayment for an order by DermaCare, Acon places DermaCare's order into a queue with orders from Acon's other authorized distributors.  Acon manufactures

and then ships the Flowflex Tests to the distributors in order of receipt of prepayment.

19.     DermaCare does not and cannot demand delivery of Flowflex Tests from Acon within a particular timeframe.  Rather, Acon informs DermaCare of the estimated wait ("lead time") for delivery, as is typical in a commercial manufacturing contract.  The lead time is specifically not a guarantee and only begins to run upon Acon's acknowledgment of the prepayment.

20.     DermaCare relays the lead time communicated to them by Acon to their customers, including Defendants.

21.     In December 2021, the lead time communicated to DermaCare by Acon was estimated to be 2 to 4 weeks.  On January 4, 2022, Acon informed DermaCare that the lead time for January was 4 to 6 weeks.  The next day, Acon informed DermaCare that the estimated lead time was again extended to 6 to 8 weeks.

22.     DermaCare promptly conveyed and accurately informed TMT of these changes to the lead time, and indicated that the lead time would not start to run until the payment is received by Acon and Acon acknowledges receipt of same.  *See*, *e.g.*, WhatsApp text exchange at January 3 ("Acon is telling us 2-4 weeks from payment - pls set those expectations with your clients - nothing happens until payment"), January 5 ("Lead times are being pushed to 4-6 weeks . . . but Acon is saying get the orders into que [sic]") and January 6 ("Per our conversation last night - we were advised by Acon that new orders now will be pushed 6-8 weeks - we are at their mercy").

23.     TMT acknowledged and accepted the changes in the lead times, and DermaCare offered the option to cancel orders, but TMT repeatedly stated in the WhatsApp texts that they did not want to do so.

**B.     Defendants Order Flowflex Tests from DermaCare and Receive the Tests within the Expected Lead Time.**

24.     Defendant TMT began to place orders with DermaCare for Flowflex Tests at the end of December.  The first order was paid for by a wire transfer from TMT to DermaCare on December 30, 2021, and the order was delivered to TMT on January 17, 2021, well within the 2-to-4-week lead time.

25.     TMT attempted to place additional orders for Flowflex Tests on Friday, December 31, 2021 – New Year's Eve.  Due to the long holiday weekend (Monday, January 3, was also an observed holiday) the orders were subject to the 4-to-6-week lead time.

26.     On January 5, 2022, Plaintiff Stone informed TMT that the lead time was extended to 4 to 6 weeks.  TMT did not ask to cancel the December 31 orders.

27.     Aware that the estimated lead time was 4 to 6 weeks (and then 6 to 8 weeks), and after acknowledging the evolving estimated lead times provided to DermaCare by Acon in both written and verbal communications between the Parties, TMT continued to place orders with DermaCare for Flowflex Tests, wiring funds to DermaCare on January 4, January 5, January 7, January 11, January 12, January 21, January 24, and January 26 – less than a week before the defamation campaign.

28.     Far from behaving as an aggrieved customer shocked by the wait for

delivery, TMT wired $109,440 to DermaCare on January 24 and $183,168 to DermaCare on January 26, in an attempt to order 23,040 and 38,562 Flowflex Tests, respectively.  The attempted January 26 order would have been TMT's second largest purchase from DermaCare, with TMT already well aware of the lead time for delivery of the tests.

29.    Just a few days after the January 26 wire, Defendants began the concerted defamation campaign described below.  DermaCare learned of the defamation and disparagement on February 2, when Defendants cc'd the Individual Plaintiffs on emails to major media outlets, the U.S. FBI, Chinese diplomats to the U.S. Department of Trade, and DermaCare's own business partners, and informed DermaCare that TMT had filed complaints with the attorneys general of at least two states, *inter alia*.

30.    For well over a week, while Defendants continued on their campaign to destroy the reputation and assassinate the character of the Individual Plaintiffs and to paint a picture of DermaCare's company reputation as that of one predicated on malfeasance in its commercial dealings, they refused to accept DermaCare's rejection of the January 26 order, demanding that DermaCare fill an extremely large order placed just a few days before and then refusing to even provide bank information so that DermaCare could refund the payment.

31.    Despite Defendants' malicious business disparagement and defamation campaign, Plaintiffs continued to deliver the Flowflex Tests to TMT until the last order of tests was delivered on February 25, 2022.  TMT received every delivery

promptly after DermaCare received the tests from Acon and exactly according to the queue; no customer who placed an order after TMT received their delivery before TMT received their own earlier-placed order.

## II. DEFENDANTS' FALSE, DEFAMATORY, AND TORTIOUS CAMPAIGN AGAINST DERMACARE

32.     In early February, customers of TMT began to contact DermaCare, demanding delivery of the Flowflex Tests they ordered from TMT, insisting that their deliveries were weeks late, and asserting that DermaCare had stolen their money.  Among other things, they claimed that DermaCare was selling the Flowflex Tests the customers had purchased to other customers for a higher price.

33.     DermaCare did not have a contractual relationship with any of these customers, who had purchased Flowflex Tests from Defendants, and DermaCare had no information about their orders, as Defendants did not identify the end customers when they placed orders with DermaCare.

34.     It was soon apparent that the source of the customer's problems was Defendants, who had made promises to their own customers that they could not keep.  For example, one customer in Florida left a voicemail with DermaCare claiming that he was waiting "almost four weeks" for his order.  In the voicemail, transcribed by DermaCare's voicemail software and retained by Plaintiffs, the caller states that he purchased the tests from TMT in two orders placed on January 10th and January 11th – well after DermaCare had informed TMT that Acon's estimated lead time was already up to 6 to 8 weeks.

9

35.     In a subsequent telephone conversation, this TMT customer stated that *TMT told him that the tests would be delivered in two days* – although TMT knew that the lead time was up to 8 weeks.

36.     Similarly, the Florida broker who had arranged the sale between TMT and this customer also complained to DermaCare.  This broker stated that on January 10th, *Defendants told her that her customer would receive the Flowflex Tests in 3 to 5 days.*

37.     By early February, DermaCare was flooded with complaints from TMT customers, persons claiming to be "mediators" for TMT, and a non-profit agency, among others, all claiming that DermaCare had stolen customer's money, had stolen government money, and was using TMT and TMT's customers as a "bank" to finance purchases of Flowflex Tests only to resell them to customers at higher prices – all false and defamatory claims.

38.     When asked the basis of these scandalous allegations, the customers and others stated that either Defendant Shafran or another partner or another agent of TMT had told them so.

39.     Defendant Shafran also personally harassed the Individual Plaintiffs, making lewd and physically threatening phone calls, including calls from ghosted numbers.  At one point, Shafran used Ms. Stone's phone number to place a ghosted call to Mr. Butler.  When Mr. Butler answered the call, expecting to hear Ms. Stone, he found himself on the line with Defendant Shafran who threatened him

10

physically.[2]

40.     The breadth of Defendant Shafran and TMT's massive, multi-faceted, and malicious campaign to disparage DermaCare and personally defame the Individual Plaintiffs was soon apparent.  Defendant Shafran had emailed false and defamatory claims to major news outlets and DermaCare's business partners, *inter alia*, a cruel, personal attack on the Individual Plaintiffs manifested in the form of click-bait articles spread across the internet.

### A.     Defendants Infect the Internet with Click-Bait "Bonnie and Clyde" Articles Falsely Accusing the Plaintiffs of Abhorrent Crimes.

41.     In the first week of February, persons – including potential customers – informed the Individual Plaintiffs of a shockingly malicious article posted on numerous internet tabloid-type websites.

42.     The article, "2022 Bonnie and Clyde – Rich Butler and Kelly Stone – DermaCare," included the following per se libel:

> The year is 1932 – location: Houston TX. They were a power couple – Bonnie and Clyde which robbed together the US Banks throughout the country, perfect harmony… She rides and he robbed the banks…
>
> The year 2022 – location Miami FL. The new Bonnie and Clyde are Rich Butler and Kelly Stone.

---

[2] Defendant Shafran also used a ghost call mechanism (or similar contrivance) in an attempt to speak with Plaintiffs' counsel.  When Plaintiffs' counsel refused to speak to him directly, Shafran called Attorney Andrew Harrison.  The call appeared on Mr. Harrison's phone as a call from his colleague, Attorney Jennifer Gross.  When Mr. Harrison picked up the call expecting to hear a message from Ms. Gross, the call was from Defendant Shafran.

> The owners of Dermacare, but this time they are not robbing US banks… They are robbing American lives! Really? sounds too extreme? States agencies, Army, VA have ordered millions of dollars through their contractor, FlowFlex self- Covid tests.
>
> The Company went nationwide to the laboratories who produce these Covid tests and found one of the main distributors – DermaCare.
>
> The company trusted and wired millions of dollars to the 2022 Bonnie and Clyde, which are Rich Butler and Kelly Stone based in Florida.
>
> Money was in their account – but no products were delivered.
>
> They used this money to make millions for themselves while risking the lives of the people that needed the Antigen home Self kits!
>
> These Kits were supposed to go to protect children, soldier and first responder. It was never delivered! They risked the pride and safety of this country – our children, our seniors, our soldiers and our first responders.
>
> Bonnie and Clyde stole money – Rich and Kelly are stealing lives!

(TexasNewsToday.com, https://texasnewstoday.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/626543/, accessed Feb. 8, 2022; *see also* UniversalPersonality.com/articles/https://eibik.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/, accessed Feb. 4, 2022; Ebik.com, https://eibik.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/, accessed Feb. 4, 2022; Zainview.com, https://zainview.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/; https://tamildatainfo.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/, accessed Feb. 4, 2022; Densipaper.com, https://densipaper.com/2022-bonnie-and-clyde-rich-butler-and-kelly-stone-dermacare/, accessed Feb. 4, 2022.)

43.    The *Bonnie and Clyde* articles also included the image below,

manipulated to show Plaintiff Butler's face instead of Plaintiff Stone's husband. The original photograph is one of Plaintiff Stone and her husband at Plaintiff Stone's 30th birthday party.  Defendant Shafran apparently stole the image from Plaintiff Stone's Facebook page.



44.     Both of the Individual Plaintiffs are happily married (to other people, not each other) and both families have young children.  The Individual Plaintiffs, their spouses, and their children were and remain distraught over the libelous presentation of them on numerous internet sites.

45.     For example, Plaintiff Stone's daughter's elementary school class was taught how to "Google" her parents in a lesson on using the Internet.  At the top of the search results were the *Bonnie and Clyde* articles, including the photoshopped picture.  Plaintiff Stone's daughter saw the articles and the picture and asked her mother about them – including why her father's face was replaced with Plaintiff Butler's.

46.     Plaintiffs allege, with substantial evidentiary support, that the *Bonnie and Clyde* articles were submitted to "pay for post" websites by Defendants.  The article has a Houston "byline," and DermaCare does not distribute FlowFlex or any Acon products to any other Houston organization or client.  Moreover, of the numerous organizations that purchased FlowFlex tests through DermaCare, not one other has even made a similar complaint.

47.     Meanwhile, the exact same accusations were simultaneously being made in numerous emails from Defendant Shafran's corporate TMT Internet account and signed by Omri Shafran next to his title as CEO of TMT.  Furthermore, the false accusations in the *Bonnie and Clyde* article are exactly the same as those that TMT's customers alleged in their calls, and they relayed that they were told about the (false) allegations from Defendants.  And aside from Defendant Shafran, TMT, and some of TMT's customers, no other person or entities have made even vaguely similar accusations.

48.     *This is not the first lawsuit against Defendant Shafran alleging defamatory internet attacks.  See, e.g., Avital v. Shafran,* No. 2013-69385 (Tex. Dist. Ct., Harris Co., filed Nov. 19, 2013).   Moreover, Shafran proudly announced his intention to defame Plaintiffs in his emails and the WhatsApp chats, as did other TMT employees and/or agents.

49.     The "Bonnie and Clyde" article posts constitute defamation *per se* and have caused and continue to cause the Individual Defendants and their family's substantial injury.

50.     The "Bonnie and Clyde" article posts also constitute business defamation and have caused and continue to cause DermaCare substantial injury including a loss of customers and loss of good will.  Multiple customers and potential customers have questioned the DermaCare about the articles, including more than one potential customer who had intended to place large orders with DermaCare and, after seeing the Bonnie and Clyde articles, took their business elsewhere.

**B.     Defendant Menin Reposts the *Bonnie and Clyde* Article and Further Defames Plaintiffs on a Rampage Posted on LinkedIn.**

51.     For example, the Defendant Menin wrote about DermaCare and the Individual Plaintiffs on LinkedIn, in response to a DermaCare's customers comment, a diatribe of false and defamatory statements about Plaintiffs, including "Lot of people got scammed [sic] be careful all !!!"; "Biggest scammers in this business stay away !!!!!!"; "[P]eople that got scammed by this [sic] horrible people"; "I will share [sic] all the people that got scammed."

52.     Defendant Menin's ranting on LinkedIn included reposting (and thus publishing) the false and defamatory *Bonnie and Clyde* article, including the title of the article, "2022 Bonnie and Clyde – Rich Butler and Kelly Stone – Dermacare" in the comment and the link to https://zainview.com/2022-bonnie-and-clyde-rich-butler-and-kellystone-dermacare/.

53.     Defendant Menin also vigorously harassed DermaCare's Logistics Director, asserting that the FBI would be contacting him directly, in a threatening exchange over the delivery of FlowFlex tests, even though the lead time for delivery

was still open.

**C.    Defendants Defame DermaCare to National Press Reporters and the FBI**

54.    On February 2, 2022, Defendant Shafran sent false, malicious, and

defamatory emails to the following reporters:

- Dave Wilson, *The Miami Herald*
- Sarah McBride, *Bloomberg*
- Jean Casarez, *CNN*
- Andrew Golden, *The Washington Post*
- Michael Morgan, *Delmarva Now*

The Individual Defendants were cc'd on each email, as were numerous employees of

DermaCare, numerous persons at Acon (with the exception of the first email, to *The*

*Miami Herald*), and numerous persons at TMT.

55.    The email to *The Washington Post* makes the following libelous claims:

> **Subject**: How Dermacare and Aconlabs stole $2M from the US Government
>
>     . . . .
>
> Texas Medical Technology has received several government purchase orders (State of Delaware as well as other government agencies) to fulfill their urgent needs for self covid tests. Once Texas Medical Technology has received the funds from the Government, we have wired 100% to Dermacare / Acon the fund (same day) in order to purchase FlowFlex Self covid test which is supposed to go to protect the health of our kids! in the State of Delaware for the school district. Covid test which is supposed to go to hospitals, home care to protect our eldry people.
>
> Dermacare/Acon failed to provide the product which caused Texas Medical Technology damages in tens of millions of dollars as well as losing our reputation.
>
> Deracare / Acon just took over $2M USD and never delivered any products. This scam and embezzled of US Government funds must stop right here and right now.

> Please let call me for further info.
>
> Omri Shafran , CEO

(Email from O. Shafran to A. Golden, *The Washington Post* (Feb. 2, 2022) (errors in original); *see also* emails from O. Shafran to D. Wilson, *The Miami Herald*; from O. Shafran to S. McBride, *Bloomberg*; from O. Shafran to J. Casarez, *CNN*; and from O. Shafran to M. Morgan, *Delmarva Now*, all dated Feb. 2, 2022.)

56.     Each email was sent from Defendant Shafran's corporate email account and was signed, "Omri Shafran, CEO."

57.     The email to the reporter at *Delmarva Now* named the Individual Plaintiffs in the subject line – clearly intended to demonize Ms. Stone and Mr. Butler personally – and changing the allegation of theft of $2 million from the U.S. government to theft from the state of Delaware:

> **Subject:** How Dermacare and Aconlabs (Rich Butler and Kelly Stone) stole $2M from the State of Delaware

(Email from O. Shafran to M. Morgan (Feb. 2, 2022).)

58.     The statements in the February 2, 2022, emails were false, and Defendants knew they were false.  Specifically, Defendants knew that the claim that "Deracare / Acon just took over $2M USD and never delivered any products" (error in original) was false because *DermaCare had delivered 74,880 Flowflex Tests to TMT prior to February 2*, including all orders that were placed during the 2-to-4-week lead time.  All remaining orders were subject to the 4-to-6-week or 6-to-8-week lead time, and none were pending for 6 weeks.

59.     Moreover, TMT had not ordered anywhere near $2 million in tests

17

from DermaCare, and certainly not with government money.  At no time did TMT ever tell DermaCare that any order was paid for with government money, nor did TMT ever tell DermaCare that any order was intended for a government purchaser, including Delaware and the Federal Government.[3]

60.     Every one of these emails was sent to at least two persons (other than Plaintiffs) who reside and were present in the state of Florida when the emails were sent.

**D.     Defendants File False Claims with Two Attorneys General, the FBI, and Attempt to Extort Acon**

61.     Also on February 2, 2022, Defendants sent an email including the same false and defamatory claims to the Special Agent in Charge of the Miami Field Office of the FBI, as well as to his deputy.  (Email from O. Shafran to G. Piro at George.Piro@fbi.gov (Feb. 2, 2022).)  This email was sent to both at the FBI Field Office in Miami, Florida.  Defendants knew at the time the email was sent that the statements contained therein were false.

62.     On February 2, 2022, Defendant Shafran sent a false and defamatory email to Michael Lynch, Vice President of Sales and Marketing at Acon, with cc's to other executives at Acon, including David Anderson, Vice President, Sales; Tim Knox, Director, North American Sales; Jay Mickelsen, Director, National Accounts; Tony Wilks, Director, European Sales; and Qiyi Xie, Vice President, Operations. The email stated:

---

[3] Only with respect to one *potential* order for the Houston school district did TMT mention a government entity, and TMT never placed that order with DermaCare.

> **Subject**: Complaint with California Attrorney general Vs Deramcare and Acon Labs
>
> Dear Mr. Lynch,
>
> We have wired almost $2M USD (US Government funds) to Acon through Dermacare Packaging (official distributor of Acon) and we didnt get products.
>
> Attached the official complaint with the Attorney General of CA.
>
> Now going to the Chinese Embassy... FBI and DA...and of course all Media
>
> I would suggest to resolve the issue ASAP ***so it wont be escalated***.
>
> Thank you
>
> Omri Shafran, CEO

(Email from O. Shafran to M. Lynch (Feb. 2, 2022), errors in original, emphasis added.)   Attached to the email was a report of a web-based form showing the complaint Defendants submitted to the California Attorney General's office ("the CA AG").[4]

      63.   The complaint submitted to the CA AG was brought *against Acon – not DermaCare* – and alleged:

> We have wired to Dermacare an authorized deal for Acon close to $2,000,000 which include State and other Government agencies money to provide us Self Tests Kits. this was five weeks ago and we didnt receive any product.  Dermacare wired the money to Acon labs and Texas Medical Technology (our company) never receive a product.

Id.

      64.   Defendants' email and complaint to the CA AG were clearly intended

---

[4] The web-based report of the complaint shows Defendant Shafran filled out the web-based form, but the information submitted describes TMT, not Shafran, as the aggrieved party.

to both (1) coerce Acon to cancel DermaCare's exclusive distribution rights (a contractual relationship) and (2) extort money from Acon, as apparent from the threat, "[n]*ow going to the Chinese Embassy . . . FBI and DA … and of course all media*" unless Acon agreed "*to resolve the issue ASAP so it won't be escalated.*"  *Id.*

65.    Defendants' submission to the CA AG was a false claim, and the allegations in the email to Acon were also false.  TMT had not paid $2 million, TMT had received Flowflex Tests from DermaCare, the tests not yet delivered were not late, and they were not purchased with government money.

66.    Moreover, on information and belief, none of the orders from TMT placed with DermaCare were made with government money.  Indeed, if Defendants were placing orders with government money, they were making quite a profit off those government entities.  Defendants paid DermaCare $4.75 per test, and charged their customers at least $6.50 per test, for a profit margin of 37% for doing nothing more than ordering the tests from DermaCare.[5]

67.    The next day, Defendant Shafran sent a follow-up email to Jinn-Nan Lin, Acon's President and Chief Technology Officer, and nine other officers and leaders of Acon.  This email repeated the false claims from the day before, but now Defendants alleged a claim for $50 million in damages, and the threat was even more explicit:

---

[5] In comparison, DermaCare paid Acon $4.00, and charged their customers $4.75 per test, a profit margin of 19% - just over half of the profit that TMT enjoyed.

**Subject**: TMT Vs. Acon Labs Inc & Dermacare Packaging and label
LLC - $50M USD damage
 . . .

*The email I wrote yesterday was a warm-up.. if I don't get a
solution by tomorrow at 2:00 PM I am going to escalate my steps
which may hurt Acon's reputation as well as very aggressive legal
actions* Including a temporary restraining order in Harris county
federal court (the petition is ready and will be filled on Tuesday).

I really try to avoid this but Acon and Dermacare do not leave us
any choice.  . . .

(Email from O. Shafran to J. Lin (Feb. 3, 2022), emphasis added, errors in original.)

68.    Defendants submitted an almost identical complaint with the Florida

Attorney General's office ("FL AG") against DermaCare.  As with the complaint

submitted to the CA AG, the complaint submitted to the FL AG included false

claims that DermaCare had not delivered any Flowflex Tests to TMT, that

DermaCare had stolen $2 million of government funds, *inter alia*.  The FL AG

investigated, requiring DermaCare to pay for attorneys to represent them in a

meeting.  The FL AG did not further pursue the investigation beyond the meeting.

69.    In a further attempt to extort Acon, Defendants also emailed various

diplomats from China, with the subject line, "Chinese company scammed the US

government and stealing US government funds."  (Email from O. Shafran to

office.beijing@trade.gov *et al*. (Feb. 2, 2022).)[6]

70.    Every one of these emails was sent to at least two persons (other than

---

[6] Defendants also threatened Plaintiffs' counsel.  In one email, Defendant Shafran
stated: "*I will make you reply* … now watch and see.  You can ignore someone else!
You think you met some kid …"  (Email from O. Shafran to B. England (Mar. 2,
2022), emphasis added.)

Plaintiffs) who reside and were present in the state of Florida when the emails were sent and when they were viewed.

### E.   Defendants Threaten DermaCare's Logistics Partner

71.   DermaCare contracts with QX Logistics to provide warehouse and logistics services for the Flowflex Tests and depends heavily on that relationship.

72.   Defendant Shafran sent an email to Chris Carey, the CEO of QX Logistics, again making false claims and threats of law enforcement and multi-million-dollar lawsuits.  This email stated:

> **Subject:** QX Logistix shipping stolen goods owned by Texas Medical Technology
>
> Dear Mr. Carey,
>
> I really apologize to get you involve but i have to inform you that right now you have in your location [in Vernon, CA] $2M USD of goods which belong to Texas Medical Technology, we highly suspect that Dermacare is shipping out our products which were paid in full (I would love to provide you wire confirmation) and selling it to other customers.
>
> We already involved the DA, Attorney General both of California and Florida, FBI and tomorrow by noon $25M USD law suit is going to be filed in Federal court in Texas.
>
> I really dont like to do it, but in order to avoid QX logistix out of the picture I would ask you to hold off all our goods until this issue will be resolved. We are going to have TRO early next week preventing them to ship any of our products.
>
> . . .

(Email from O. Shafran to C. Carey (Feb. 2, 2022), errors in original.)

73.   The subject line's claim that "QX Logistix [is] shipping stolen goods owned by Texas Medical Technology" together with "we already involved DA, Attorney General both of California and Florida, FBI and tomorrow by noon $25M

USD law suit is going to be filed" and "in order to avoid QX logistix out of the picture I would ask you to hold off all our goods until this issue will be resolved" is clearly intended to interfere with the contractual relationship between DermaCare and a critical contractual relationship.

74.    This email included the false, disparaging claims that DermaCare was delivering TMT's goods to other customers and that QX Logistics was holding stolen goods, *inter alia*.  Defendants also asserted the former claim to their customers and others.

75.    Every one of these emails was sent to at least two persons (other than Plaintiffs) who reside and were present in the state of Florida when the emails were sent and when they were viewed.

**F.    Defendants Continue to Defame DermaCare and the Individual Plaintiffs Although Documents – Including TMT's Own – Show that TMT Mishandled their Orders.**

76.    Defendants have made the same false and defamatory claims to numerous others, including competitors and potential customers, and to persons in Florida.  The statements listed in these paragraphs are not inclusive of all actionable statements.

77.    For example, on February 19, 2021, Defendants emailed at least one Florida customer and one Florida broker that DermaCare had delivered to the customer Flowflex Tests that were recalled by the FDA.  (Email from O. Shafran to

B. England (Feb. 19, 2022).  The product at issue was never sold by DermaCare.[7]

78.     Defendants knew this claim was false when it was made, because DermaCare had not yet delivered the order intended for that customer to TMT. Also, DermaCare delivers the product to TMT, who then delivers to their customers. If DermaCare had delivered the EU version of the test, it would have been immediately obvious to TMT, as the boxes for the EU version are dark blue and the boxes for the U.S. version are white.

79.     Moreover, the false, defamatory, and disparaging emails continue.  For example, on February 20, Defendant Shafran sent two emails to DermaCare's counsel and included customers on the respective emails.  Both stated that DermaCare had not delivered the tests that were ordered for those customers 7 to 8 weeks earlier, and in one case the email stated, "DermaCare is the company who holds 100% of your money[.]" (Emails from O. Shafran to B. England (Feb. 20, 2022).  DermaCare had long since delivered the product ordered in December and the first week of January.

80.     DermaCare's bank statements accurately report the wire transfers from TMT, including the dates of each transfer.  The Bill of Lading also accurately reports the delivery of Flowflex Tests to TMT, including the dates of each delivery.

---

[7] The Flowflex Tests sold in Europe are certified by the European Union ("the EU") and are different than the Flowflex Tests sold in the U.S. and approved by the FDA. Apparently, some of the tests certified by the EU for sale in Europe had appeared in the U.S.  No one (other than Defendant Shafran) has even suggested that DermaCare had ever distributed the EU version of the tests, and DermaCare has never received the EU version of the tests from Acon or any other person or entity.

Yet Defendants insisted on an entirely fabricated version of the transactions, publicly claiming that DermaCare had not made deliveries when they had.

81.     Based on TMT's customers' complaints, it appears that TMT did not place all of those customers' orders with DermaCare.  Among other things, some of the orders described (by size) in Defendants' emails are not reflected in DermaCare's bank statements.  In other words, Defendants have claimed that they placed orders for particular customers on or near a particular date, but there are no wire transfers that appear in the bank statements on or near that date that match the size of the order.

82.     TMT very recently sent to DermaCare TMT's own record of the wire transfers.  TMT's list of wire transfers matches exactly DermaCare's bank statements, both by date and by amount of each transfer.

83.     In an email including a customer, a broker, and an intermediary, Defendant Shafran acknowledged that the lead time was 4 to 6 weeks and claimed to have informed them all at the time of the sale, entirely reversing course after insisting for weeks that the customer's delivery was late.  "We committed to 4-6 weeks (by the way) so i don't know where it was lost in the communication."  (Email from O. Shafran to S. Gurba (Feb. 27, 2022).)

### G.     Defendants' Agent in Florida Also Makes False and Defamatory Statements to Customers and Business Partners

84.     Henya (Hannah) Hertzel contacted Acon, from her home or office in Florida, and falsely stated that Plaintiffs were "scammers" that had stolen money from TMT and its customers.  Plaintiffs learned of this via email from Acon.  The

email from Acon identifies Ms. Hertzel as the caller and relays her statements.[8]

85.     Ms. Hertzel also made the same statements false and defamatory statements to multiple clients of TMT, by email, by chat, and by telephone.  Those customers include, but are not limited to, Sam Katz, Chief Sales Officer of Gekay Sales and Service, Inc.; Daniel Weinstock, Vice President of Sales, Span 39, Ltd.; and Steve Gurba.  Plaintiffs are in possession of such written correspondence as forwarded by the recipients.

**H.     Defendants' Defamation Campaign Cost Plaintiffs Millions of Dollars in Sales.**

86.     Multiple customers declined to complete large-scale purchases of FlowFlex tests from DermaCare after reading and/or hearing Defendants' false and defamatory statements about Plaintiffs.

87.     Among those that cancelled or failed to follow through with purchases late in the order process include WeShield (expected order of over 1 million tests), AJR Buying Group, LLC (expected order of over 1 million tests), and Mex Healthcare (expected orders of 1 million and 5 million tests).  All three of these lost accounts reported to DermaCare that they had seen and been influenced by the Bonnie & Clyde article and/or defamatory statements directly from Defendants.

**I.     TMT is Sued by a Party Unrelated to DermaCare and Files but Fails to Pursue a Third-Party Complaint Against DermaCare, Including Factual Allegations that TMT Knew Were False.**

88.     On February 7, 2022, a company by the name of APX Supplies &

---

[8] This email was included as an exhibit to Plaintiff's Opposition to Defendant's Motion to Dismiss the original complaint.  *See* ECF No. 36, Butler Decl., Exh. B.

Trading ("APX") filed a complaint against Texas Medical Center Supply ("TMCS") in Texas state court. *APX Supplies & Trading, LLC v. Texas Medical Center Supply, LLC*, No. 2022-07261 (Tex. Dist. Ct. (Harris Co.), filed Feb. 2, 2022). The complaint alleges that APX purchased 70,000 Flowflex Tests from Texas Medical Center Supply and that APX (as of the filing date) had not received the tests.

89.     According to the APX complaint, APX had purchased Flowflex Tests from TMCS, and subsequent to that purchase, TMCS changed its name to Texas Medical Technology, LLC. (Complaint, *APX Supplies & Trading, LLC v. Texas Medical Center Supply, LLC*, at n.1.) APX's complaint states, "This defendant changed it name to Texas Medical Technology, Inc., but the name used in this suit is the name of the defendant as relates to the operative purchase order being litigated in this lawsuit." *Id*.

90.     There were no transactions between TMCS and DermaCare. If TMCS is the same entity as TMT, all transactions with between the entity and DermaCare occurred after the legal name change from TMCS to TMT.

91.     On the very same day that APX's complaint was filed, TMT filed an answer to the complaint and third-party complaint against DermaCare, alleging that DermaCare was responsible for TMCS's failure to deliver the tests at issue in the contract between APX in TMCS.

92.     The allegations in the complaint are clearly false, and easily proven so. DermaCare has no purchase order from TMT for 75,000 Flowflex Tests for APX. When DermaCare's counsel reached out to counsel for both TMCS/TMT and APX

asking about the purchase order for the APX order, neither attorney would respond. Weeks have passed, and still neither counsel for APX or TMCS/TMT have responded.

93.     There is no wire transfer in DermaCare's bank statements that resemble the order at issue in the APX complaint.

94.     In the correspondence between DermaCare and TMT, there is no mention of APX or any late order that resembles the order at issue in the APX complaint.

95.     The third-party complaint filed by TMCS/TMT alleges that DermaCare "agreed to deliver 250,135 Test Kits to Defendant in Houston, Texas that have not been delivered." (Answer and Third-Party Complaint, *APX Supplies & Trading v. Texas Medical Center Supply*, at ¶4.2.) This statement is false and misleading. As of the date of that TMCS/TMT filed the third-party claim, DermaCare had delivered to TMT 74,880 Flowflex Tests, and the remainder of the test were not late.

96.     The third-party complaint includes a number of false and defamatory statements, but because TMCS/TMT never properly served the complaint and never any proof of service with the court, the case is stagnant. *See* Texas Court Rules, R. 107(h), "(h) No default judgment shall be granted in any cause until proof of service as provided by this rule . . . shall have been on file with the clerk of the court ten days, exclusive of the day of filing and the day of judgment."

97.     Counsel for DermaCare attempted repeatedly to confer with counsel for TMCS/TMT and counsel for APX without success.

98.     Defendants TMT and Omri Shafran informed Plaintiff's counsel that they fired the attorney that filed the third-party complaint, but that counsel has not withdrawn from the case.  (Email from O. Shafran to J. Gross (Feb. 20, 2022), "Benjamin hall doesn't represents us anymore"; Email from O. Shafran to J. Gross (Feb. 20, 2022); Email from O. Shafran to J. Gross (Feb. 20, 2022) "Currently TMT doesn't have a Consoul. Feel free to communicate with me directly"); Email from O. Shafran to J. Gross (Feb. 21, 2022), "As stated before Benjamin hall is no longer represents us. Please communicate with me in regards the law suit we filed and any other concerns you have.  We will let you know once we have a new consoul;" errors in original emails.)

99.     If TMPS/TMT serve DermaCare in the Texas state court action, DermaCare will defend the against the third-party claims appropriately.  The documentation – including the records of wire transfers and purchase orders – clearly show that that no order from APX to TMPS/TMT was placed with DermaCare.

**COUNT ONE**
**VIOLATION OF THE LANHAM ACT**
**(Brought by Plaintiff DermaCare against both Defendants)**

DermaCare realleges and incorporates herein by reference ¶¶ 7-87, above, as if fully set forth herein.

Defendant's publication of false and disparaging statements about DermaCare and the Individual Plaintiffs constitutes business disparagement, unfair competition, false advertising, and false description under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

TMT purchases and resells products in interstate commerce, including Flowflex Tests, which it purchases from DermaCare in Florida and resells in Texas and other states (including Florida).

TMT and DermaCare are in direct competition in the wholesale market for personal protective equipment, COVID-19 tests, and other products.  For example, TMT is a competitor of DermaCare in the market for the Flowflex Tests, in that TMT's customers could purchase Flowflex Tests directly from DermaCare at a lower price.

Defendants' false and disparaging statements misrepresent the nature, characteristics, and qualities of DermaCare's goods, services, and commercial activities.

Defendants made these false and disparaging statements about DermaCare and the Individual Plaintiffs for the commercial purpose of diverting blame from TMT for misleading its own customers regarding the lead time for delivery of

Flowflex Tests.  DermaCare did so in an attempt to retain the disappointed customers who would otherwise refuse to continue doing business with TMT, to protect TMT's reputation with potential customers, to discourage potential customers from purchasing Flowflex Tests and other products directly from DermaCare, and in a concerted effort to drive DermaCare's customers away from DermaCare and toward TMT.

Defendants caused these false statements to enter interstate commerce by (1) sending them via email across state lines, (2) posting the *Bonnie and Clyde* article on multiple Internet sites, where it is visible and has been seen throughout the United States, and (3) using cellular networks to relay the false statements via voice, text message, and instant messaging.

Defendants' false and disparaging statements have the tendency to deceive a substantial segment of prospective and current customers of DermaCare and did in fact deceive such customers.  *See e.g.,* section II.A-H, *supra,* describing distinct emails to major media, including *The Miami Herald*, *Bloomberg*, *CNN*, *The Washington Post*, and *Delmarva Now*; to law enforcement; to Plaintiffs' business partners; as well as the *Bonnie & Clyde* publications and direct communications to Defendants' customers.

Many of Defendants' false and disparaging statements about DermaCare are literally and patently false.  Others implicitly convey a false impression, are misleading in context, and/or are likely to deceive consumers.

Defendants' deception is material in that it is likely to influence purchasing

decisions.  Specifically, current and potential purchasers of Flowflex Tests (and other products) have been deceived to believe that DermaCare "scammed the US government" and "stole $2M from the US Government" and "never delivered any products," and that the CEO and Managing Director of DermaCare are a "modern day Bonnie and Clyde."

The false statements made by Defendants are highly detrimental to DermaCare's reputation, goodwill, and sales.

As a direct and proximate result of Defendants' conduct, DermaCare has sustained substantial damages (both direct in the form of lost sales and indirect in the form of loss of goodwill/reputation).

Defendants' false statements have caused, and will continue to cause, irreparable harm to DermaCare unless Defendants are enjoined by the Court.

Plaintiff DermaCare is entitled to relief in the form of compensatory damages, treble damages pursuant to 15 U.S.C. § 1117, an award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, an injunction, and such other relief as the Court deems just and proper.

## COUNT TWO
## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (Brought by Plaintiff DermaCare against both Defendants)

DermaCare realleges and incorporates herein by reference ¶¶ 7-87, above, as if fully set forth herein.

The foregoing conduct constitutes a violation of the Florida Deceptive and

Unfair Trade Practices Act (the "FDUTPA"), Florida Statutes, § 501.201 *et seq*.

Defendants' campaign of spreading false and disparaging statements about DermaCare and the Individual Plaintiffs constitutes an unfair and a deceptive act in trade and in commerce.

DermaCare has and continues to suffer substantial damages as a direct and proximate result of Defendants' unfair and deceptive acts, including but not limited to lost profits, loss of goodwill, and reputational damage. These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction. For example, just one potential sale worth over $1,000,000 was lost after the customer viewed the *Bonnie and Clyde* article on the Internet.

Defendants' conduct is willful in that they knowingly made false statements about Plaintiffs in an effort to mislead consumers and unfairly drive business away from DermaCare. *See supra,* Section II, describing Defendant's willful conduct in knowingly making false statements to Defendants' customers that DermaCare did not deliver any product, when, in fact, TMT had received – and had to know that they had received – shipments from of FlowFlex tests from DermaCare at the time, and within the stated lead time.

Plaintiff DermaCare is entitled to relief in the form of compensatory damages, punitive damages, injunctive relief, an award of costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.2105, and such other relief as the Court deems just and proper.

## COUNT THREE
## BUSINESS DISPARAGEMENT
### (Brought by Plaintiff DermaCare against both Defendants)

Plaintiff realleges and incorporates herein by reference ¶¶ 7-87, above, as if fully set forth herein.

As set forth more fully above, Defendants have made numerous defamatory and disparaging statements about DermaCare and the Individual Plaintiffs to potential customers, current customers, law enforcement, business partners, and the news media.

Defendants' statements were false when made, and Defendants at all times relevant hereto knew the statements were false when they made, published, and then re-published them.

As a direct and proximate result of Defendants' actions, DermaCare suffered substantial damages, including but not limited to lost profits, reputational damage, and loss of goodwill. These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction as the damages from the loss of just one sale exceeds $1 million.

DermaCare is entitled to punitive damages, as Defendants acted with malice and/or disregard for DermaCare's rights.

Plaintiff DermaCare is entitled to relief in the form of compensatory damages, punitive damages, injunctive relief, an award of costs, and such other relief as the Court deems just and proper.

**COUNT FOUR**
**DEFAMATION PER SE**
**(Brought by the Individual Plaintiffs against both Defendants)**

The Individual Plaintiffs reallege and incorporate herein by reference ¶¶ 7-87, above, as if fully set forth herein.

The Defendants made false and defamatory statements about the Individual Plaintiffs, including but not limited to the posting of the *Bonnie and Clyde* article on various Internet websites.

Defendants also made numerous statements accusing the Individual Plaintiffs of embezzlement of $2 million from the government and stealing from their customers, *inter alia*.

These statements are actionable per se, without a showing of special damages, as they charge that the Individual Plaintiffs have committed serious crimes, subject the Individual Plaintiffs to hatred, distrust, ridicule, contempt, and disgrace, and injure the Individual Plaintiffs in the practice of their trade.

The Individual Plaintiffs are entitled to compensatory damages, punitive damages, injunctive relief, costs, and such other relief as the Court deems just and proper.

**COUNT FIVE**

**INTERFERENCE WITH BUSINESS RELATIONSHIP**
**(Brought by all Plaintiffs against both Defendants)**

Plaintiff realleges and incorporates herein by reference ¶¶ 7-87, above, as if fully set forth herein.

Plaintiffs had ongoing and prospective business relationships with wholesalers, suppliers, and warehouse and logistics partners that were damaged or lost as a consequence of Defendants' false and deceptive statements.

Defendants had actual knowledge of Plaintiffs' business relationships, as evidenced by Defendant Shafran's emails to Acon and QX Logistix, *inter alia*.

Defendants intentionally and unjustifiably interfered with Plaintiff's business relationships by making the false and defamatory statements, which described more fully above, including statements made to DermaCare customer WeShield, who subsequently withdrew their order from DermaCare.

As a direct and proximate result of Defendants' actions, DermaCare's business relationships suffered and potential business was lost entirely, causing DermaCare substantial damage, including, but not limited to, lost profits, reputational damage, and loss of goodwill.  These damages far exceed this Court's $75,000.00 threshold for diversity jurisdiction as the damages from the loss of just one sale exceeds $1 million.

Plaintiffs are entitled to judgment against Defendants for compensatory damages, punitive damages, preliminary and permanent injunctive relief, costs, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against the Defendants and in favor of the Plaintiffs, and award:

1) actual damages, in an amount in excess of $75,000 and to be determined at trial,

2) damages pursuant to 15 U.S.C. § 1117, up to three times the award of actual damages,

3) attorney's fees and costs, as permitted by Florida law and 15 U.S.C. § 1117,

4) punitive damages, in an amount proven at trial,
5) injunctive relief, and

6) any such further relief as the Court deems just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury with respect to all claims so triable.

Dated:  June 2, 2022              Signed: /s/*Denise Calle*

Denise Calle (FL Bar No. 127292)
Jennifer Gross (admitted *pro hac vice*)
Hannah Kreinik (admitted *pro hac vice*)

**Benjamin L. England & Associates, LLC**
810 Landmark Drive, Suite 126
Glen Burnie, MD 21061
Phone: (410) 220-2800
Fax: (443) 583-1464
dcalle@englandlawgroup.com
jgross@englandlawgroup.com
hbkreinik@englandlawgroup.com

*Counsel for Plaintiffs*